Good morning. I'm Paul Eaglin from Fairbanks, Alaska, appearing on behalf of Ms. Davis, Christy Davis. Thank you for the appointment to assist the court in this case. What I'd like to do, or an approach that I would like to take in order to avoid covering what has been briefed, is to try to concentrate on the transition in the law that occurred at the time that this decision came down a couple of years ago, because the argument that I'm making on behalf of Ms. Davis is that the district court, in granting summary judgment as it did, failed to take account of the proper weight to be given to circumstantial evidence in an employment discrimination case such as this, and failed to take account that circumstantial evidence suffices equally as direct evidence in a context such as this. This occurred, the 2005 summary judgment in this case, occurred before the Cornwall case of last year, and there was this progression going on in our context pretty much from the followed thereafter by the case that the district court relied on in accepting the magistrate judge's R&R, which was the McGinnis case. This case then issued, and of course, the district court relied on that, the magistrate judge relied on McGinnis. Thereafter, Cornwall came down, and our argument is that this court should overrule summary judgment. It could look even to the findings of fact and the R&R by the magistrate judge to see that one, circumstantial evidence was, in some cases, mischaracterized. It was, in fact, direct evidence, as I indicated in the briefing, that circumstantial evidence also was not properly weighted, and that it should have been weighted equally to direct evidence. Using those, then, the court could follow Cornwall, and of course, the court would find itself, I believe, in the same, what I've described as the conceptual tension that the Cornwall case described, which is whether a panel of this court could overrule or should be seen to be overruled. But why don't you just sort of assume for the moment that you have evidence that it's a similar evidence, whether it's circumstantial. Just tell us why you think the evidence that you have precluded the district court from granting summary judgment. I understand your concern about the problem with our cases, and there's reason to have some concern. Our cases aren't entirely clear, but we can try to work that out. But just tell us, under your view of the law, why you think there shouldn't have been summary judgment. There should not have been summary judgment. Just working from the magistrate judges' R&R and accepting that as the basis, the factual basis that we're relying on. She described, for example, comments in the workplace directed to Ms. Davis that, one, this is a man's world. It's a man's working world. There's one possible meaning for that. Another one is that the world of electricians' trade is a man's world. That's one. Secondly, there is the invitation for her to leave, to be understood as possibly leave this job. In fact, there were attempts, and they were looking into possibilities of other places to reassign her to. That's one meaning. Another meaning is, leave the trade of electricians. You're not wanted here. You're a woman. Electricians' trade is a man's profession. Of course, that's not so. That's another indication. And in reliance on that, I would rely on, or rather in support of that, I would rely on the Cornwall Court's discussion of the invitation for a black executive in the credit union to leave employment there, and the inferences that the Court said could be drawn from that. That's a second instance. She was not permitted to go to the trailer or the meeting place, the morning meeting place, that was attended only by men. There were a number of... Are you focusing on the hostile work aspect of your case, or the disparate treatment? Those affect both. I would say that they do. That's my argument to you, is that they affect both, because we see, for example, from Cornwall, that those were the types of instances that the Court relied on in saying, these circumstantial instances... On the disparate treatment counsel, I'd like your thoughts on this. If your client were the only person that was laid off, that would be a pretty straightforward case. But in this case, as I understand it, there were like 18 people laid off, 17 of whom were men, because there was less business. How do you get around that problem? Isn't one of the elements of showing the cause of action here that you have to show that she was treated differently because she was a woman? Yes. How do you get around the problem of the 17 men? That's true. She must show that, but if we look at the entire context here, which she would have the opportunity to do, if she were able to present her case to a jury, if summary judgment had not been entered, then I think we would be able to see the full context rather than to isolate on just that single... But that's one of the elements of the cause of action, though. And as a matter of law, if it's clear that that happened and you don't have some pretextual response or something, how do we get around that? There really is no case, is there? No, but her response with respect to whether there was pretext are the instances in which she was, in fact, in the workplace treated differently than men. And it's entirely possible that... Okay, let's assume all of that, as Reinhart suggested. Let's assume from what we, of course, have read the record. We see all of the sexist and unfortunate comments that were made. Right. But let's assume all of that is true and uncontested. As far as the disparate treatment is concerned, she still has to show that because of her sex, she was treated differently in the connected women's layoff. And I'm asking you, counsel, if you will please, tell me how she meets that burden since 17 men were also let go. And the best that I could do, Your Honor, is to say that you would have to judge the entire context. I think if you were to look, if you're going to look at the other 17 men and bring them into the equation, then that's also... Well, maybe you could put it a little differently, counsel. Maybe if you got to the stage where you got passed under the McDonnell-Douglas test, you got past step one, and you showed the facts you're talking about, the general problems, that she had had, that they had taken an adverse employment action against her before, as the magistrate judge assumed, by giving her the most difficult work to do because she was a woman. And then she's terminated, which is an adverse employment action. All right. Then the burden shifts to them to show, articulate a reason for the termination, a legitimate reason. Now, the question is, when they say there's a layoff, is that a legitimate reason for why they laid her off? Or is that an explanation of the fact that there was a layoff? What is their burden at that point? Did they explain any reason why she was selected to be one of the persons laid off? The explanation that I understand from the record, Your Honor, is downturn in the business for that. No, no. That's my question. Did they explain why she was selected to be laid off? I don't know of a specific one for her, Your Honor. You mean a layoff? The question is not, was there a layoff. The question is, why was she, why was the adverse employment action taken against her, as opposed to the people it wasn't taken against? Why was she selected to be one of the persons laid off? Is there anything that the company stated? Was it because of her seniority, because she had not performed her job as well? They had to make selections of who was going to be laid off, right? Is there anything in the record that the company advanced as to why she was selected for the layoff? I don't know of a specific one for her, Your Honor, other than the general explanation of a layoff because of downturn in business. That's the only specific information that I have. The answer is no, I guess, that there was no reason given as to why she was selected for the layoff. I'm not aware of one, Your Honor. That's correct. And the question is, did they then articulate a legitimate reason for laying her off? That's the question. All right, continue with the argument. He's a very good lawyer, I want you to know. Judge Reinhart is a very good lawyer. I was just trying to find out what your position was. I was just trying to rely on, based on what I understood from the record, which is that was their explanation, and her response, as I understand also from the record, is that the entire context of her workplace there explains why she would say, even though there's not an indication from the company, her response would be, this is the real explanation for why you laid me off. Look at this entire context that I worked in, the monotone, the assignments, and so forth. So I think that's the best that I could do to respond to your question, Your Honor. It was really a simple question as to what the record showed, as to what explanation the company had given for selecting her as the layoff. And I gather your answer is it was not. I'm not aware of one. Yes, that's correct, Your Honor. Your Honor, I would like to save part of my time for rebuttal. All right, thank you. My name is Pam Stendhal. I represent Electric. There were three claims, a retaliation claim, a hostile work environment claim, and a disparate treatment claim. I'd like to spend just a little bit of time on each to tell you why you should affirm the district court on each of those claims. Counsel, I wonder if we could start. I wonder if we could start. Your Honor, I'm interested in a response to Judge Reinhart's question. In the record, is there any evidence that was provided by the company as to why Ms. Davis personally was selected to be among the people who were laid off? No. The direct answer to that is no, not specifically. What is in the record is some information why she wasn't laid off in the first round of layoffs. As you know, there were three rounds of layoffs, and she was in the second round. And there is information in the record that she was not selected for the first round because of her quality of work and her seniority. Why she was selected for the second round, there's no evidence in the record for you. Is there any burden on the part of the company to respond to a prima facie claim by Ms. Davis concerning district treatment? Isn't it your burden to come back and respond why she was selected? We didn't come back and respond why she was selected specifically, as to any other of the 17 folks that you mentioned. What we did do is come back and say, this is why the layoffs occurred, and she was one of these 17 or 18 folks that we laid off. Suppose there were 1,000 people working at the company, and she was one of the first 100 hired, and you had to lay off two people, and you laid off her and someone else. Would it be enough for you to come back and say, well, we laid off two people? I don't think so. I don't think so. And I don't think so because of the Stegall case where there were two people terminated amongst a whole changeover in the whole plan of the organization. But in this case where there were, and I don't know in the record if it shows how many employees Kim Electric had at the time, so I can't tell you that, and I don't know that it's there. But of the 17, I think Judge Smith was correct. She was one, the one female, and the rest were all male. How many female employees were there? And that's not in the record either, Your Honor, to my knowledge. Well, that's the problem I have with this case is that my impression is that she would not, if she had been the least senior, there would be no difficulty understanding it. My impression was she wasn't, that there were people with less seniority who were not laid off. That's correct. There is evidence that some of the folks were more senior than her and less senior than her, and also that the collective bargaining agreement did not require that they go by seniority. So they did it according to the collective. But in the absence of some explanation as to why she was selected for the layoff, I don't really see, this is good for myself, I don't really see how you refuse the presumption that arises that it's clearly an adverse action, she's clearly somebody who meets her death, and you're to come forward and say, here's our reason why we laid her off. And what you said is we had a reason to lay some people off. But I don't see, and this is where you could help me, I don't see where that meets the burden of saying this is why we laid her off. Well, and again, the specific instance with regard to her, I agree, is not in the record. What is in the record, though, is that Team Electric came back and showed that in the late summer of 2001, they had a downturn of work that resulted in multiple rounds of layoffs. And that's what's in the record. That's the legitimate non-discriminatory reason she was one of many. Well, I'll tell you what we did, what the council did in the last case. Let's assume this is the only black worker in the company. You're going to lay off 17 out of 100 workers. And he says, they've been discriminating against me, they've always treated me badly, I've had problems there, and I'm one of the people they picked to lay off. Wouldn't it be enough of an answer for you to say, well, he was one we picked? We hope it is. The district court thought it was. Well, I know. Well, that seems to me the problem with the district court's decision. And I understand, Your Honor, and just to be as frank as I can, there is no evidence in the record that I'm aware of that tells specifically why she was chosen among the 18 that were laid off. And you do acknowledge that your client had the burden to respond for the very reason that Judge Reinhart indicated? I acknowledge that we had the burden to come forward with a legitimate non-discriminatory reason. Now, we did that with regard to her. As to her. We didn't do it specifically. I have to hand it in. Well, you would pretty much concede that with respect to the disparate treatment cause of action, that we're probably going to have to send this back to the district court so that the – you've got a burden issue. Your client may totally win on this, but you've got to come forward with evidence that shows why she was selected, do you not? We continue to believe that we put forth sufficient evidence of a legitimate non-discriminatory reason in general.  As to the group. And that's the best that I can do for you. Yes. With regard to the other two claims, I'd like to just briefly talk about the retaliation claim, if I may. There, again, no doubt that there was some protected activity and an adverse employment action. But what happens and where this claim fails is that there's no causal connection between the two. The only circumstantial evidence that the plaintiff puts forward is the proximity of time in which these things happen. So there is a workers' compensation claim filed in May of 2001. There's a Bureau of Labor and Industries claim filed in June. And then her layoff occurs in early September. So three to four months difference between these actions. This case, I would distinguish from the Stegel case in which the plaintiff complained that it was only nine days later that she was terminated. And so the proximity of time there is much closer. This case, I would submit, is much closer to the McGinnis v. GTE case, the Vasquez v. County of Los Angeles case, and also the Cornwell case, in which the only circumstantial evidence those plaintiffs relied on for the retaliation claim was the proximity of time argument. Now, those cases, admittedly, the time length in between the protected activity and the adverse action was longer than here. I think Cornwell was eight months, and that was the shortest. But there the court found that that was just simply insufficient to create the causal connection on a retaliation claim when that's the only evidence. And here I would submit that the proximity of time is the only evidence and the causal connection simply just is not made. And for that reason, the district court was correct in granting summary judgment on the retaliation claim. On the hostile workplace claim, what the district court found was that it was insufficiently severe and pervasive in the workplace to change the conditions in terms of her employment. And I wanted to just briefly go over some of the evidence that's in the record for you. First of all, Davis was employed by Team Electric for a year and four months. So the comments that were made were over that entire time span. The comments were things such as this. Bill Burkett needs a girlfriend, and she was assigned to work with Bill Burkett. The donuts are for the guys. This particular foreman, Lyle Lowry, referred to his wife as astro-bitch, told the plaintiff on her first day not to go to the trailer where the guys took their morning breaks. There's a coworker named Dave Davis who said, we don't mind if females are working here as long as they don't complain. Another statement. Counsel, I wonder if I could get your thoughts on something. I used to be on the California Fair Employment and Housing Commission, which is basically a civil rights commission. We had lots of sexual harassment cases. And what I learned there was that in sexual harassment cases, the men aren't looking for sex. They're saying it's a power thing. They want these women to, in quotes, understand that they're interfering with their economic expectations, and they don't like them being there. When I read the allegations in this, you've got supervisors saying this kind of thing, and specifically this is a man's working world out here, you know. Isn't this a classic example of people in power saying to this woman who wants to have a lawful occupation, lady, you don't belong here. Get out. We want to make it as uncomfortable for you as possible. It would be the classic situation if that person were the decision maker in the layoff. But what you've got in the record before you is a completely devoid record of who the decision maker was. Well, that may be true for the retaliation, but what about the hostile work environment? The hostile work environment, I think that's still part and parcel of it. I think that what you've got to do is see whether or not, and this came up in the Vazquez v. County of Los Angeles case, see whether or not the people who make the comments are somehow also related to the adverse action that actually happened. So in Vazquez, there's a co-worker, and I should say Vazquez was a national origin discrimination case, a co-worker who makes some negative comments to Mr. Vazquez, who's a Hispanic man, such as typical Hispanic macho attitude and that you should get a job in the field because Hispanics do good in the field. These are, I think, similar in nature to the types of comments that were made here and that what the court found there was that the summary judgment was granted, and this court affirmed the summary judgment because those comments made by a co-worker were nowhere connected to the ultimate adverse employment action. But again, I'm getting back to the hostile work environment situation. I agree with respect to retaliation, there's got to be a nexus, but with respect to the hostile work environment, of the, I don't know how many we've got here, but roughly 10 comments that show up on the record that are sexist and demeaning, at least half of them are made by supervisors that directly determine where this woman works, what she does, what she doesn't. Right, and again, Your Honor, I think that what we have to look at is the greater context. So within a year and four months, you've got these 10 comments. Over a year and four months, that's less than one comment every 45 days. Is that the way we measure sexual harassment? Well, it's one of the ways I think we have to look at it. If this had happened within a three-month period, I think this would be a very different case. If these things were happening daily, in the Dominguez-Curry case, for example, where there was evidence of daily sexually explicit jokes, there were repetitive direct statements about, I won't hire a guy. If you girls were guys, you'd know what you were doing. I can't recite all the statements to you, but there were numerous, and it was more of an everyday. And, in fact, there was also, I think, a physical intimidation component where he kicked someone's chair, things of that nature. I mean, that's when you decide whether this is severe and pervasive. And I would submit to you that on this record, it is not severe and pervasive. Let me ask you one other aspect about that. If it were simply the sexual comments, that's really what you've been arguing up to now, and legitimately in response to Judge Smith's questions. What weight do you give in judging the hostile workplace claim to the fact, which I guess we have to assume because the district judge said that she would assume that she had been given the most dangerous work assignments because she was a woman. Is that part of the hostile workplace claim? I think they would like it to be part of the hostile workplace claim. And what I believe the record will show, does show, is that, in fact, most of the time that Ms. Davis was working, she was working side by side with a male. I believe the record will show that there were more dangerous jobs on this job site, which she was never assigned to, and that I understand that one of the assignments that she disliked was working with Monocote. I believe there's evidence in the record that every employee on that site worked with Monocote to some extent. You couldn't get away from it. It was there. You're on a construction site. What she did was she asked for certain jobs. She wanted certain jobs. She was the only person, the evidence will show, that specifically requested certain positions, and she was accommodated to the best she could be. I agree with you. There is evidence in the record from which you could also conclude that the company made a lot of efforts to accommodate her complaints, and that when she did complain, they moved her to another job. But a lot of that's really in dispute as to the legitimacy of her complaints about the Monocote. Was she really subjected to it more than the males in general were? What I was saying really is that the district judge said we should assume for purposes of summary judgment that she was given the most difficult job because she was a woman. If you assume that and you add that to the comments, does that make it a hostile worker? Well, no, I don't think so, again, because the district court also found that even assuming that, giving her the benefit of the doubt and saying, yes, that was all accurate, she did get more dangerous assignments, it still didn't rise to the level of severe and pervasive. Well, I know the district court did, but that's what I'm asking you, whether that's correct, if you add that to what Judge Smith was asking you about. I believe that that's correct. And what we have to do is really look at the cases as we've got them for guidelines. We've got Dominguez-Curry, we've got Cornwell, and those cases have obviously different facts. But somewhere on the spectrum, there's Vasquez down here where everything is firmed on appeal, and we've got some cases over here where the hostile work environment district treatment claims were reversed on appeal. And our case falls somewhere in the middle. But I submit to you that I believe it falls much closer to the Vasquez case than it does with some intermittent, what I will call stray remarks. Doesn't it, Counselor, seem like you're really straightforward about this, and I appreciate it, but you've got the reasonable woman standard. In this particular case, isn't the conduct that is alleged here at least to a level where a trier of fact ought to look at that and evaluate? They may indeed find that a reasonable woman could not conclude that this was a hostile work environment, but is this the kind of level that at a summary judgment proceeding, we ought to just say, well, that's, you know, it is per se not a hostile work environment? I have to say I think it is per se. And one of the things that I wanted to do is, you all know, but I'd like to remind you just what the definition of a stray remark is because I think many of these are stray remarks. And I think this was in the Godwin case where the court defined what a stray remark is, and they say that a stray remark is uttered in an ambivalent manner and is not tied directly to the plaintiff's termination. And this is where I think I was coming back to that. The remarks have to be made by somebody who's then in the power to follow through. But not in a hostile work environment claim. That's a retaliation issue. You can have somebody who continues to work at an organization that can have a successful hostile work environment, can't you? I suppose you can, yes. But in the context, again, I have to say that some of the comments, I think, were made months before any kind of adverse action was taken, before anything happened. It was over the course of a year and four months. They were by different people, coworkers, comments like the donuts are for the guys. There is just nothing clearly sexist about that. I would disagree with counsel when he says there was direct evidence of sexist comments. Again, I think that this is all circumstantial. We'll agree with you that donuts are for the guys is not a sexist comment. I'm running very short on time. If the court has any other questions, I'd be happy to answer them otherwise, I think, for the time. Thank you very much. You have a lot of time left, but you don't have to take it. I understand that. Indeed, we would encourage you not to do so. And I will follow that advice, Judge. And other than to say that if there are any questions for me, I'd be happy to answer them. But I think what we have here very clearly is a record that is not the type of record in which summary judgment properly should enter there. There are a number of factual questions here, a number of inferences that probably should have been left to a jury. There are a number of credibility issues that should have been left to a jury. This is not a proper case for summary judgment. Thank you. Thank you, counsel. Thank you both very much for the argument. The final case for the oral argument this morning is Emmerd Industrial Corporation v. Partisan Associates. Thank you.
judges: Goodwin, Reinhardt, M. Smith